**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WAVERLY SCOTT KAFFAGA, as Executrix of the Estate of Elaine Anderson Steinbeck, *Plaintiff-Appellee*, | No. 18-55336 |
| | D.C. No. 2:14-cv-08699-TJH-FFM |
| v. | |
| THE ESTATE OF THOMAS STEINBECK, GAIL KNIGHT STEINBECK, and THE PALLADIN GROUP, INC., *Defendants-Appellants.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, Jr., District Judge, Presiding

Argued and Submitted August 6, 2019
Anchorage, Alaska

Filed September 9, 2019

Before: Richard C. Tallman, Sandra S. Ikuta,
and N. Randy Smith, Circuit Judges.

Opinion by Judge Tallman

# SUMMARY[*]

## Damages

The panel affirmed the district court's compensatory damages award, vacated the jury's punitive damage award against defendant Gail Knight Steinbeck, and remanded to the district court with instructions to dismiss the punitive damages claims against Gail, in an action alleging claims concerning disputed interests in John Steinbeck's literary works.

In the wake of a long history of litigation, a federal jury awarded plaintiff Waverly Kaffaga, as executrix of the Estate of Elaine Steinbeck (John Steinbeck's wife), approximately $5.25 million in compensatory damages for slander of title, breach of contract, and tortious interference with economic advantage, and $7.9 million in punitive damages against defendants – Gail Knight Steinbeck (the author's daughter-in-law), the Estate of Thomas Steinbeck (the author's son) to which Gail is executrix, and the Palladin Group, Inc. (which Gail Steinbeck owns and controls).

The panel affirmed the district court's orders granting summary judgment and striking defendants' defenses to tortious interference on grounds of collateral estoppel arising from this court's, and the Second Circuit's, prior decisions. The panel further held that the district court's decisions to exclude evidence related to defendants' different understanding of the parties' 1983 settlement agreement, or

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the validity of prior court decisions, were not abuses of the trial court's discretion.

The panel affirmed the jury's compensatory damages award on all causes of action in the clearly written and fully answered special verdict form because they were supported by substantial evidence. The panel further held that suspicion of double recovery was not enough to reverse the jury's verdict. The panel also held that the compensatory damages here were not speculative because they were based on reasonable estimates by lay and expert testimony, as well as documentary evidence.

The panel held that the record contained overwhelming evidence of Gail and Thom Steinbeck's malice to support the punitive damages award. The panel further held that any possible error in the district court's evidentiary decisions was harmless. The panel held that plaintiff failed to meet her burden of placing into the record "meaningful evidence" of Gail Steinbeck's financial condition and ability to pay any punitive damages sufficient to permit a comparative analysis on appeal, as required by California law. The panel therefore vacated the $5.9 million punitive damage award against Gail, and remanded to the district court with instructions to dismiss the punitive claims against Gail.

## COUNSEL

Matthew J. Dowd (argued), Dowd Scheffel PLLC, Washington, D.C.; Matthew I. Berger, Matthew I. Berger Law Group, Santa Barbara, California; for Defendants-Appellants.

Susan J. Kohlmann (argued), Alison I. Stein, and Brittany R. Lamb, Jenner & Block LLP, New York, New York; Andrew J. Thomas, Jenner & Block LLP, Los Angeles, California; for Plaintiff-Appellee.

**OPINION**

TALLMAN, Circuit Judge:

PROLOGUE

> "This 'suit has, in course of time, become so complicated, that . . . no two . . . lawyers can talk about it for five minutes, without coming to a total disagreement as to all the premises. Innumerable children have been born into the cause: innumerable young people have married into it;' and, sadly, the original parties 'have died out of it.' A 'long procession of [judges] has come in and gone out' during that time, and still the suit 'drags its weary length before the Court.'"

*Stern v. Marshall*, 564 U.S. 462, 468 (2011) (Roberts, C.J.) (quoting Charles Dickens, *Bleak House*, in 1 Works of Charles Dickens 4–5 (1891)). "Those words were not written about this case . . . but they could have been." *Id.*

Appellants Gail Knight Steinbeck ("*Gail*"), the Estate of Thomas Steinbeck (to which she is executrix), and The Palladin Group, Inc. ("*Palladin*") (which she owns and controls) (collectively, "*Defendants*"), have vowed they will not stop litigating their interests in profiting from John Steinbeck's literary works until Gail draws her "last breath." The parties (and their predecessors in interest) have been

litigating over the bequests in John Steinbeck's will and the changes in copyright laws as they impact on rights to his intellectual property for almost half of a century. Most notably, the parties have repeatedly disputed the meaning and validity of a 1983 settlement agreement (the "*1983 Agreement*") entered between Elaine Steinbeck ("*Elaine*"), the widow of John Steinbeck, and Thomas Steinbeck ("*Thom*") and John Steinbeck IV ("*John IV*," collectively with Thom, his "*Sons*"), and their rights to control and profit from the various John Steinbeck books.

In this latest round, a federal jury in Los Angeles unanimously awarded Waverly Kaffaga ("*Kaffaga*" or "*Plaintiff*"), as executrix of Elaine's estate, approximately $5.25 million in compensatory damages for slander of title, breach of contract, and tortious interference with economic advantage, and $7.9 million in punitive damages against Defendants. On appeal, Defendants argue, among other things, that (1) prior litigation related to the 1983 Agreement did not decide whether Defendants had termination rights under 1998 amendments to U.S. copyright laws, (2) the district court improperly excluded evidence relating to Defendants' intent, which they raised as a defense to intentional interference with Kaffaga's efforts to negotiate movie rights to Steinbeck works and punitive damages, (3) the punitive damages award was not supported by meaningful evidence of Gail's financial condition and was excessive under California law, and (4) the compensatory damages awarded were duplicative and speculative.

We have jurisdiction under 28 U.S.C. § 1291. We affirm the compensatory damages award and vacate and remand with instructions to dismiss the punitive damages claims against Gail.

CHAPTER I

> "There ain't no sin and there ain't no virtue.
> There's just stuff people do.  It's all part of
> the same thing.  And some of the things folks
> do is nice, and some ain't nice, but that's as
> far as any man got a right to say."  John
> Steinbeck, *The Grapes of Wrath* 23 (2002).

During his lifetime, John Steinbeck registered and renewed the copyrights to his works, including *The Grapes of Wrath*, *Of Mice and Men*, *East of Eden*, and *The Pearl*, so that they were protected by the version of the Copyright Act in effect at the time.  When John Steinbeck died in 1968, he left his interests in his works to his third wife, Elaine.  The Sons, John's by a previous marriage, each received a $50,000 gift in a trust, which, according to Gail, was "pretty substantial money for two boys just coming back from Vietnam."

The Sons later acquired an interest in some of Steinbeck's later works[1] when the interests had to be renewed.  *See* 17 U.S.C. § 304(a)(1)(C).  To try to resolve their competing interests Elaine and the Sons entered into an agreement in 1974 (the "*1974 Agreement*") that provided Elaine would receive 50 percent of the domestic royalties to the works, and the Sons would each receive 25 percent.

---

[1] Steinbeck's early works were renewed before he died in 1968 and are not at issue in this case.

In 1976, Congress amended the Copyright Act. One of the amendments created termination rights[2] for certain heirs with respect to certain categories of works. *See* Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541 (effective 1978). If the work is subject to termination under the Copyright Act, § 304(c)(5) indicates that termination "may be effected notwithstanding any agreement to the contrary." 17 U.S.C. § 304(c)(5); *see also* 17 U.S.C. § 304(d)(1) (providing for termination under the same circumstances).

In 1981, following the amendments to the Copyright Act, the Sons sued Elaine in the United States District Court for the Southern District of New York contesting the 1974 Agreement and accusing Elaine of fraud. *John Steinbeck, IV and Thom Steinbeck v. Elaine Steinbeck*, No. 81 Civ. 6105 (S.D.N.Y. Dec. 8, 1982). The parties entered into the 1983 Agreement to settle the dispute.

The 1983 Agreement provided that the Sons would receive an increased share of the royalties from the works— one third each, rather than a quarter. In exchange, Elaine received "complete power and authority to negotiate, authorize and take action with respect to the exploitation and/or termination of rights" in the works.

In 1995, Thom married Gail. The couple thereafter formed Palladin, a management and production company in

---

[2] Under certain circumstances, federal copyright law allows authors or their heirs to terminate the prior grant of a transfer or license of an author's copyright in a work or of any other right under a copyright. *See* 17 U.S.C. §§ 203, 304(c), 304(d). To terminate a grant, a written, signed termination notice must be served on the grantee or the grantee's successor-in-interest, and the termination notice must be recorded with the U.S. Copyright Office.

Los Angeles.**[3]**  In 2003, Elaine passed away.  Pursuant to the 1983 Agreement, her daughter, Waverly Kaffaga, as executrix of Elaine's estate, stepped into Elaine's shoes as successor under the 1983 Agreement.

In 1998, Congress again amended the Copyright Act. These amendments added an additional termination right, exercisable during a five-year window opening 75 years after the first publication of a copyrighted work.  *See* Pub. L. No. 105-298, 112 Stat. 2827 (1998).

In 2004, Thom and Blake sued Kaffaga and others involved in publishing the works in the Southern District of New York (and Kaffaga and the publishers countersued), which resulted in numerous decisions by both the district court there and the United States Court of Appeals for the Second Circuit (the "*New York Litigation*").  The parties (and others) have been litigating their rights under the 1983 Agreement ever since.  *See, e.g.*, *Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 395 (S.D.N.Y. 2006), *rev'd sub nom. Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008); *Steinbeck v. McIntosh & Otis, Inc.*, No. 04 CV 5497 (GBD), 2009 WL 928189 (S.D.N.Y. Mar. 31, 2009), *aff'd sub nom. Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572 (2d Cir. 2010), *cert. denied*, 564 U.S. 1012 (2011).  Relevant here, the Second Circuit concluded that the 1983 Agreement was a valid and enforceable agreement, which "forecloses any argument that the parties intended the [Sons] to retain control over Elaine['s] exercise of the authority conferred upon her." 400 F. App'x at 575.

---

**[3]** In 1991, John IV passed away, and his daughter, Blake Smyle ("*Blake*"), and his former wife inherited his interest.

Despite their losses at the Second Circuit, the plain language of the 1983 Agreement, and a stipulated judgment they signed forgoing all further litigation, Thom and Blake continued spending time and treasure asserting rights courts had already told them they did not have.  In 2014, they sued Kaffaga and others in the United States District Court for the Central District of California seeking, among other things, a declaration that the 1983 Agreement was an "agreement to the contrary" under 17 U.S.C. §§ 304(c) and (d) and therefore could not prevent them from exercising termination rights.

The district court in Los Angeles (Hon. Terry Hatter) dismissed Thom and Blake's case in 2015, holding that their claims were precluded by the doctrine of collateral estoppel because the Second Circuit had conclusively determined that the 1983 Agreement was valid and enforceable.

In November 2017, we affirmed the district court's 2015 ruling in Thom and Blake's case, holding in no uncertain terms that all issues presented on appeal were barred by collateral estoppel.  *Steinbeck v. Kaffaga*, 702 F. App'x 618, 619–20 (9th Cir. 2017).  We concluded that the Second Circuit "squarely held" that the 1983 Agreement is valid and enforceable, and "[t]he district court correctly concluded that the Sons already have fully litigated whether they have a right to issue and exploit copyright terminations of Steinbeck's works, and that the prior litigation held that the Sons do not have those rights." *Id.*  Thus, Thom and Blake's arguments to the contrary were precluded.  *See id.*

## CHAPTER II

"An unbelieved truth can hurt a man much more than a lie."  John Steinbeck, *East of Eden* 264 (1992).

In 2014, after Thom and Blake brought their action that was dismissed in 2015 and affirmed on appeal, Kaffaga countersued by filing this case in the Central District of California. She alleged breaches of the 1983 Agreement, slander of title, and tortious interference with economic advantage in the time since the New York Litigation had ended, and she sought punitive damages. Among other things, Kaffaga alleged that Defendants had continued to attempt to assert various rights in Steinbeck works despite their previous court losses establishing they had no such rights. Those attempts led to multiple Hollywood producers abandoning negotiations with Kaffaga to develop screenplays for, among other things, a remake of *The Grapes of Wrath* and *East of Eden* involving highly successful movie producers and well-known actors.

Judge Hatter granted Kaffaga summary judgment on her breach of contract and slander of title claims and left the resolution of contested facts regarding the tortious interference claims for the jury to decide.

In the summer of 2017, Judge Hatter ruled on motions in limine. Judge Hatter granted Kaffaga's motion to preclude evidence and argument related to issues decided by prior courts without prejudice to Defendants' filing a motion in limine to introduce such evidence that could otherwise be shown to be relevant and not amounting to relitigation. The court later denied Defendants' motion in limine to permit certain subsets of that evidence and argument related to the prior litigation, reiterating that the New York Litigation had established that "the 1983 Agreement bound the parties' heirs, successors, and assigns." Prior to trial, the district court also struck defenses Defendants argued were applicable to the tortious interference claims as precluded by the prior decisions in this litigation.

Beginning on August 29, 2017, the district court conducted a five-day jury trial with 13 witnesses, including Thom (by video deposition) and Gail, and the admission of 78 exhibits.  The court sustained several objections to testimony by Gail related to her justification for contacting various producers or attempting to compete with Kaffaga in negotiating with Hollywood studios the disputed control of rights in various John Steinbeck works, including her contrary understanding of the previous court decisions. Certain testimony and documents about Gail's and Thom's reasoning and understanding of the 1983 Agreement and the prior court decisions were nonetheless permitted at trial and not stricken, including testimony conveying their lack of respect for the previous adverse court decisions.

After careful and correct instruction by the district court on all issues in the case, the jury unanimously found for Kaffaga on the remaining claims and awarded $13.15 million in compensatory and punitive damages against Defendants:

- $1.3 million for Kaffaga's breach of contract claim;

- $1.3 million for Kaffaga's slander of title claim;

- $2.65 million for Kaffaga's intentional interference of prospective economic advantage claim; and

- $7.9 million for punitive damages, including $5.925 million against Gail individually.

In February 2018, after the jury had spoken, the district court denied Defendants' motion for judgment as a matter of law, new trial, and/or remittitur. It held that judgment as a matter of law and a new trial were inappropriate because the jury's verdict was reasonable and supported by substantial evidence. The court also denied remittitur because it was "not convinced that the jury should have reached a different verdict or that the verdict reached was improper."

## CHAPTER III

> "There's more beauty in truth, even if it is dreadful beauty." John Steinbeck, *East of Eden* 360 (1992).

We review the granting of summary judgment de novo. *Ford v. City of Yakima*, 706 F.3d 1188, 1192 (9th Cir. 2013) (per curiam). We review evidentiary rulings for abuse of discretion and only reverse if any abuse was prejudicial. *Nevada Dep't of Corr. v. Greene*, 648 F.3d 1014, 1018 (9th Cir. 2011); *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (reversal only when an erroneous evidentiary ruling "substantially prejudiced" a party).

We review a jury's verdict, including compensatory and punitive damages awards, for substantial evidence. *In re Exxon Valdez*, 270 F.3d 1215, 1247–48 (9th Cir. 2001) (compensatory damages); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 907 (9th Cir. 2002) (punitive damages).

Denial of a motion for new trial and remittitur are reviewed for abuse of discretion. *See Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042, 1046 (9th Cir. 2009). Denials of motions for judgment as a matter of law are reviewed de novo. *See Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 797 (9th Cir. 2017). We must avoid reversing

a jury verdict for lack of evidence or alleged double recovery if the verdict is capable of a "correct interpretation" that is not illegal, and if the verdict is not "hopelessly ambiguous." *Roby v. McKesson Corp.*, 219 P.3d 749, 760 (Cal. 2009), *modified*, (Feb. 10, 2010); *Flores v. City of Westminster*, 873 F.3d 739, 751–52 (9th Cir. 2017), *cert. denied sub nom. Hall v. Flores*, 138 S. Ct. 1551 (2018).

## CHAPTER IV

> "Can it be that haters of clarity have nothing to say, have observed nothing, have no clear picture of even their own fields?"     John Steinbeck, *The Log from the Sea of Cortez* 62 (1995).

We previously held in 2017, in affirming the dismissal of Thom and Blake's suit concerning the rights allocated in the 1983 Agreement, that "the parties have already litigated the precise issues raised in this suit '*ad nauseum*' in the Second Circuit" and that "[t]he district court correctly concluded that the Sons already have fully litigated whether they have a right to issue and exploit copyright terminations of Steinbeck's works."[4]  *Steinbeck v. Kaffaga*, 702 F. App'x at 619–20.  Defendants' arguments in this case (Kaffaga's suit) were squarely before us in the earlier case (Thom and Blake's suit), and we held that all of defendants' arguments there were precluded by the decisions of the Second Circuit. *See id*.; *see also* Dkt. No. 40-1 at 7, 18.  In the most recent

---

[4] We grant Appellee's motion for judicial notice [Dkt. No. 40] and Defendants' motion for judicial notice [Dkt. No. 54] as unopposed and because they are the proper subjects of judicial notice in evaluating a claim of collateral estoppel, including examination of the briefing filed in the prior federal court cases.  *See Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1319 (9th Cir. 1998).

trial in August 2017, the district court's summary judgment and evidentiary rulings were consistent with our prior holding. Those decisions were correct, and we will not revisit them here. Whether a prior disposition is published or unpublished is of no consequence—unpublished decisions have the same preclusive effect. *See* 9th Cir. R. 36-3 (unpublished dispositions and orders are precedent for the purposes of the doctrine of law of the case or rules of claim preclusion or issue preclusion).

Therefore, we affirm the orders granting summary judgment and striking Defendants' defenses to tortious interference on grounds of collateral estoppel. It follows that the district court's decisions to exclude evidence related to Defendants' different understanding of the 1983 Agreement or the validity of prior court decisions were not abuses of the trial court's discretion. In any event, the record indicates that the district court allowed Gail to testify about her understanding of the 1983 Agreement and the Copyright Act at trial.

Defendants must now stop attempting to relitigate the validity and enforceability of the 1983 Agreement, including whether it is an "agreement to the contrary," and their understanding of the 1983 Agreement and the plethora of court decisions interpreting it. They must also stop representing to the marketplace that they have any intellectual property rights or control over John Steinbeck's works. The 1983 Agreement vests those control rights exclusively in Kaffaga, as successor to her mother Elaine, and is enforceable according to its terms. Various federal courts, including this one, have repeatedly affirmed Elaine and Kaffaga's exclusive control. This has to end. We cannot say it any clearer.

CHAPTER V

"And now that you don't have to be perfect, you can be good."  John Steinbeck, *East of Eden* 585 (1992).

We affirm the jury's compensatory damages award on all causes of action in the clearly written and fully answered special verdict form because they are supported by substantial evidence.  *See In re Exxon Valdez*, 270 F.3d at 1247–48.  The evidence of damages attributed by the jury to each cause of action was sufficiently separate and non-duplicative under California law.  *Roby*, 219 P.3d at 760; *see also Flores*, 873 F.3d at 752 (holding there was not impermissible double recovery from multiple defendants and affirming the jury verdict where substantial evidence permitted "a correct interpretation" of the jury's verdict that avoided finding double recovery).  And we presume that the jury followed the district court's thorough and clear instructions to avoid double recovery.  *See United States v. Johnson*, 767 F.3d 815, 824 (9th Cir. 2014).

Defendants point to circumstantial evidence that the verdict is reversible as double recovery under *Khoury v. Maly's of Cal., Inc.  See* 17 Cal. Rptr. 2d 708, 712 (Cal. Ct. App. 1993) (rejecting tortious interference and breach of contract as separate causes of action that would lead to double recovery for the same harm).  It is true that because the district court granted summary judgment on Plaintiff's breach of contract and slander of title causes of action here, the jury was only asked specific factual questions about tortious interference and reached $2.65 million in total tortious interference damages.  The special verdict form then asked more generally about damages for breach and slander because the court had granted summary judgment on those

claims.  The jury answered by giving identical sums of $1.3 million to each.  The fact that the jury gave $1.3 million for both slander and breach and, when combined, now nearly equal the $2.65 million awarded for tortious interference is indeed suspicious.

But suspicion of double recovery is not enough to reverse a jury's verdict, and this case is distinguishable from *Khoury*.  *See id.* at 711 ("*sole alleged* [tortious] conduct of [the defendant] was the breach of contract" (emphasis added)); *see also Walker v. Signal Cos., Inc.*, 149 Cal. Rptr. 119, 125 (Cal. Ct. App. 1978) (impermissible double recovery where *no separate evidence* supported distinct awards for damages in contract and tort).  As an initial matter, *Khoury* was at the motion to dismiss stage; it did not overturn a jury verdict.  Moreover, Kaffaga presented evidence of tactics or actions that violated the 1983 Agreement that were not independently tortious, like Gail's attempting to negotiate separately for her own piece of option deals.  And the jury heard evidence of Defendants' separate, tortious conduct such as lying, meddling, slandering, and threatening litigation to harm Kaffaga and Elaine's estate.  *Cf. Roby*, 219 P.3d at 759–60 (new trial required because even the plaintiff's proposed approach to interpreting the verdict so as to avoid double recovery created "an inconsistency" in the amounts actually awarded, and the plaintiff admitted there was "no *evidence* of an act of discrimination that [wa]s separate from her failure-to-accommodate and wrongful-termination claims").

The district court here carefully cited the facts it believed supported breach of contract "and/or" slander of title to the jury, such as Gail's statements (1) to the Executive Vice President of Business Affairs at DreamWorks that he "should read this attachment very carefully before you

decide to make a deal with the Scott family alone" because "the two-thirds owners of that copyright want to make a deal with you" and "give you the chain of title you need"; (2) that the adaptation of *The Pearl* is one of "a few current projects for which we control the underlying rights";  and (3) to a third party concerning an *East of Eden* movie deal that Kaffaga's agent did not represent Gail and Thom "on a copyright termination because it created a brand new set of rights," that someone at the studio needed to call her in relation to "who is out there marketing the brand and 'new set of rights' because somebody could get in trouble," and she and Thom "don't want that to happen."

Therefore, the record contains substantial evidence to support the awards on each cause of action independently, especially giving deference to the jury's verdict. *See McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 955 (9th Cir. 2011); *see also Tavaglione v. Billings*, 847 P.2d 574, 580 (Cal. 1993) (in bank) ("[W]here separate items of compensable damage are shown by distinct and independent evidence, the plaintiff is entitled to recover the entire amount of his damages, whether that amount is expressed by the jury in a single verdict or multiple verdicts referring to different claims or legal theories.").

The compensatory damages here were also not speculative; they were based on reasonable estimates established by lay and expert testimony, as well as documentary evidence. *GHK Assocs. v. Mayer Grp., Inc.*, 274 Cal. Rptr. 168, 179–80 (Cal. Ct. App. 1990) ("The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." (citing *Allen v. Gardner*, 272 P.2d 99, 102 (Cal. Ct. App. 1954) ("[J]ustice and public polic[y] require that the wrongdoer shall bear the

risk of the uncertainty which his own wrong has created." (citation omitted))))). We affirm the jury's compensatory damages award on all causes of action.

CHAPTER VI

> "[I]ntentions, good or bad, are not enough."
> John Steinbeck, *The Winter of Our Discontent* 99 (2008).

California law provides for punitive damages where the defendant has acted with "fraud, or malice," express or implied, which must be proven with clear and convincing evidence. Cal. Civil Code § 3294(a). "There must be an intent to vex, annoy, or injure." *Gombos v. Ashe*, 322 P.2d 933, 939 (Cal. Dist. Ct. App. 1958) (holding "negligence, even gross negligence, is not sufficient to justify" punitive damages). The requisite intent to support punitive damages is malice, and it "may be proved 'either expressly (by direct evidence probative on the existence of hatred or ill will) or by implication (by indirect evidence from which the jury may draw inferences).'" *Neal v. Farmers Ins. Exch.*, 582 P.2d 980, 987 n.6 (Cal. 1978) (quoting *Bertero v. Nat'l Gen. Corp.*, 529 P.2d 608, 625 (Cal. 1974)).

Defendants argue that Gail did not act with the requisite intent to sustain punitive damages but could not properly explain that to the jury due to the district court's rulings on the motions in limine and preventing certain lines of questioning.**[5]** Kaffaga responds that Defendants are really

---

**[5]** Defendants focus most of this argument on their justification defense for tortious interference. However, because that defense was stricken prior to trial and Defendants do not challenge that decision except by arguing collateral estoppel did not preclude it—which it did—

complaining that "Gail 'was not allowed to fully explain' her answers when she was cross-examined by" Kaffaga, which is simply the nature of cross-examination.  We agree with Kaffaga that Defendants could have presented evidence related to Gail and Thom's understanding of their rights and the New York Litigation in other ways, including on redirect examination.  Regardless, Kaffaga maintains that any error was harmless.

Kaffaga has the better argument.  Gail was at times not permitted to answer beyond the scope of the questions on cross-examination; her responses related to her belief about rights she actually held and the impact of the New York Litigation in settling those issues were properly stricken as beyond the scope of direct.  But the court occasionally permitted Gail to explain her beliefs about her and Thom's putative rights in various works, or otherwise instructed her that she could more fully explain answers about her understanding of agreements and court decisions when her own attorney examined her on direct.  And on cross examination by her own counsel when she was called to testify during Kaffaga's case-in-chief, the court overruled at least one of Kaffaga's objections related to Gail's beliefs about her rights because Gail's counsel explained that he was seeking to clarify items Kaffaga asked Gail about on direct.[6]  These evidentiary decisions were reasonable and

we only analyze the district court's evidentiary decisions in the context of punitive damages.

[6] As to the proposed testimony from potential witness Louis Petrich regarding Gail and Thom's termination rights and their "complexity," the district court did not abuse its discretion in excluding it.  Indeed, the district court carefully examined whether Petrich, an attorney who apparently previously consulted with Thom and Gail about their termination rights, could offer any testimony other than improper expert

balanced; the court did not abuse its discretion. *See United States v. Olafson*, 213 F.3d 435, 442 (9th Cir. 2000) (finding no abuse of discretion where the district court's evidentiary decisions were well-reasoned and comported with precedent).

Kaffaga fails to respond to defense challenges to one series of sustained objections during Gail's direct testimony in the Defendants' case-in-chief where the district court limited her testimony regarding the New York Litigation and Gail and Thom's alleged termination rights. However, assuming *arguendo* that those rulings were erroneously reasoned, they were not abuses of discretion because the complaint framing the issues for trial only alleges causes of action based on facts arising after the Second Circuit's decision in 2010. Evidence of, and argument regarding, Gail and Thom's beliefs prior to 2010 were not relevant to whether Defendants should have been subjected to punitive damages for their actions post-2010.

Moreover, the record contains multiple instances that were not stricken of Gail testifying that she believed she and Thom actually had retained certain control rights to various John Steinbeck works. And Defendants argued at trial, including during closing statements to the jury, that they did not act with the requisite intent to support punitive damages. Additional testimony and argument regarding those beliefs

---

testimony on his legal opinion. The court's conclusion that Petrich's testimony would be irrelevant and improper legal opinion was correct and was not an abuse of discretion. *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) ("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." (emphasis omitted) (citation omitted)). Petrich was also not properly disclosed as a testifying expert before trial, and therefore could not testify as an expert. *See* Fed. R. Civ. P. 37(c).

would have been unnecessarily cumulative and may very well have damaged Defendants' case by belaboring their lack of respect for previous court decisions.

Even more importantly, the record contains overwhelming evidence of Gail and Thom's malice to support the punitive damages award, and thus any error was harmless.  The jury did not credit Gail's forceful assertion of her belief that she and Thom maintained termination and negotiation rights, and that they attempted to separately negotiate with the studios in order to maximize profits from the sale of intellectual property rights in Steinbeck's works. The testimony at trial instead established that Gail and Thom knew about the 1983 Agreement and the various court decisions upholding the fact that Elaine (and Kaffaga) control Steinbeck's works.  It further showed that Gail and Thom attempted to exercise their purported negotiation and termination rights anyway, and that Thom "had no intention of stopping [his] challenge to all of these things, so it really didn't make a lot of difference to [him] that a decision would go one way or the other until [he'd] finally won."

Additionally, the documentary evidence that Defendants were knowingly and purposefully acting contrary to those court decisions, including written statements that the rulings in the New York Litigation "won't stand" and were "always going to be nebulous, [and] always going to be at risk," is devastating.  The documents demonstrate that, when they learned that Kaffaga was negotiating film rights for *The Grapes of Wrath* and *East of Eden*, Gail and Thom intended to insert themselves and thwart negotiations by "riddl[ing them] with lawsuits."  The record stands as persuasive evidence that they made good on the threat.

The documents further show that Gail and Thom acted out of hatred and ill will, contrary to Defendants' arguments

that they were only acting in their own economic interest and thus not attempting to actually impede any deals. *See Bertero*, 529 P.2d at 625 (improper motive of "hatred or ill will" meriting the award of punitive damages). Gail wrote in an email that she was "just pissed" and planned to litigate even though it would cause a "pricey situation with little [return on investment]." Thom himself penned that he sued Kaffaga in New York because he "didn't agree with her maintaining [his] father's inheritance." And the jury could have reasonably interpreted Gail's insistence on negotiating with production companies in secret to mean that she knew such negotiations behind Kaffaga's back were improper.

We hold there is more than ample evidence of Defendants' malice in the record to support the jury's verdict, triggering entitlement to punitive damages. *See Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002) ("A jury's verdict must be upheld if it is supported by substantial evidence . . . , even if it is also possible to draw a contrary conclusion."). To the extent there were any erroneous decisions that prevented some evidence about what rights Gail and Thom believed they had, there was no abuse of discretion and, regardless, any error was harmless. *See Molina v. Astrue*, 674 F.3d 1104, 1119 (9th Cir. 2012) (holding "a district court's erroneous exclusion of evidence does not warrant reversal unless the error more probably than not tainted the verdict" (internal quotation marks and citations omitted)).

## CHAPTER VII

"With a few exceptions people don't want money. They want luxury and they want love and they want admiration." John Steinbeck, *East of Eden* 541 (1992).

Defendants argue that the punitive damages award against Gail is illegally excessive under California law.[7] They contend there is insufficient evidence of Gail's financial condition and ability to pay to support punitive damages. And, in so many words, even if the evidence is sufficient to sustain some amount of punitive damages, the $5.9 million awarded against Gail is disproportionately large compared to her financial condition.[8]

When faced with a challenge to the size of punitive damages under California law, reviewing courts must "determine whether the award is excessive as a matter of law or raises a presumption that it is the product of passion or prejudice." *Adams v. Murakami*, 813 P.2d 1348, 1350 (Cal. 1991) (in bank). This "'passion and prejudice' standard does not occur in a vacuum, but is measured against," as relevant here, "the ratio between the damages and the defendant's net worth." *Boyle v. Lorimar Prods., Inc.*, 13 F.3d 1357, 1360 (9th Cir. 1994) (per curiam) (quoting *Las Palmas Assocs. v. Las Palmas Ctr. Assocs.*, 1 Cal. Rptr. 2d 301, 323 (Cal. Ct. App. 1991)); *see also Neal*, 582 P.2d at 990 (seminal California Supreme Court case). It is the plaintiff's burden to place into the record "meaningful evidence of the

---

[7] The propriety of punitive damages is a matter of state law; thus California law applies here. *See Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989).

[8] For the first time in their reply, Defendants argue that the Plaintiff failed to "identify any evidence relating to the financial wherewithal of Thom or Palladin that would warrant punitive damages [of $2 million] against either of them." This argument may have had legs had it been properly raised in the opening brief. But the issue is not properly before the panel because it was neither raised in the opening brief nor to the district court. *See Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093 n.3 (9th Cir. 2007) (appellants forfeit an "argument by raising it for the first time in their reply brief").

defendant's financial condition" to support a defendant's ability to pay. *Adams*, 813 P.2d at 1349, 1357–60. "The rule established by lower California courts is that only net, not gross, figures are relevant." *Boyle*, 13 F.3d at 1361; *see also Lara v. Cadag*, 16 Cal. Rptr. 2d 811, 813 n.2 (Cal. Ct. App. 1993), *modified*, (Mar. 9, 1993). The record thus must contain sufficient evidence of Gail's assets, income, and liabilities and expenses for the punitive damages award to stand. *See Boyle*, 13 F.3d at 1361.

Gail testified that she receives between $120,000 and $200,000 per year from domestic book royalties from John Steinbeck's works. At the time of trial, she and Palladin had four television series and six feature films in development, with three "in some form of prep," and she testified that she would be "paid for these projects when they are optioned or licensed." Yet, Kaffaga introduced no estimate of Gail's potential income from those endeavors or the total value of her other intellectual property assets, and thus they cannot serve to support the punitive damages award. The record contains some testimonial evidence about her lack of expenses, including no minor children, mortgages, or other debts. But Kaffaga failed to adduce any other evidence, including, for example, an expert accountant to examine Gail's financial records to estimate her liabilities or net worth.[9]

The record indisputably contains some evidence of Gail's financial condition. However, we conclude that

---

[9] At oral argument, Plaintiff's counsel referenced problems obtaining that evidence during discovery because Gail was uncooperative. But Plaintiff failed to (1) show where she sought to compel additional evidence from Gail and was denied, (2) seek an adverse inference instruction at trial, or (3) brief either point.

Plaintiff failed to meet her burden of placing into the record "meaningful evidence" of Gail's financial condition and ability to pay any punitive damages award sufficient to permit us to conduct the comparative analysis on appeal required by California law. *See Adams*, 813 P.2d at 1350; *see also Kelly v. Haag*, 52 Cal. Rptr. 3d 126, 130 (Cal. Ct. App. 2006) (reversing a punitive damages award for lack of evidence where there was vague testimony by a layman regarding the defendant's assets and liabilities that was otherwise unsupported by documentation or expert testimony); *Boyle*, 13 F.3d at 1361. In reviewing the record, we are unable to come to even a reasonable approximation of Gail's net worth. Without that, we have nothing to compare to the size of the award to complete the excessiveness analysis under California law. We therefore vacate the jury's punitive damages award against Gail for lack of evidence of her ability to pay, and remand to the district court with instructions to dismiss the punitive claims against Gail. No additional evidence or briefing on the issue is necessary.

## CHAPTER VIII

> "We asked a gentleman by us, if he knew what cause was on? He told us [Steinbeck]. We asked him if he knew what was doing in it? He said, really no he did not, nobody ever did; but as well as he could make out, it was over. 'Over for the day?' we asked him. 'No,' he said; 'over for good.'" "Over for good!" Charles Dickens, *Bleak House* 865 (1991).

This dispute is indeed over. We reverse and vacate the punitive damages award against Gail. All other issues and

the award of compensatory damages are affirmed. The district court may wish to reconsider Kaffaga's request for an injunction to put an end to this recidivist litigation. This panel will retain jurisdiction over any subsequent appeals.

Costs are awarded to the Appellee.

**AFFIRMED IN PART AS TO COMPENSATORY DAMAGES CLAIMS, VACATED AND REMANDED IN PART WITH INSTRUCTIONS TO DISMISS THE PUNITIVE DAMAGES CLAIMS.**